Argued and submitted June 15, reversed August 12, 1987

DENNEHY,
*Petitioner,*

*v.*

CITY OF PORTLAND,
*Respondent.*

(LUBA No. 86-098; CA A44018)

740 P2d 806

Gregory J. Howe, Portland, argued the cause and filed the brief for petitioner.

Kathryn Beaumont Imperati, Portland, argued the cause for respondent. With her on the brief was Jeannette M. Launer, Legal Counsel for Portland Development Commission.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

NEWMAN, J.

Deits, J., dissenting.

## NEWMAN, J.

Petitioner seeks review of LUBA's affirmance of the City of Portland's Tenth Amendment to its Downtown Waterfront Urban Renewal Plan.[1] The area affected by the amendment is entirely within both the city and Multnomah County. The city council approved the amendment, but the county commission has not acted on it. The sole issue is whether LUBA erred by concluding that approval by the county governing body is unnecessary and that the city's action alone is sufficient for the amendment to take effect.

ORS 457.010(6) provides:

> " 'Municipality' means any county or any city in this state. 'The municipality' means the municipality for which a particular urban renewal agency is created."

"The municipality" is the city in this case. ORS 457.085(5) requires an urban renewal plan to be "presented to the governing body of each taxing district affected" by the plan. ORS 457.085(6) provides:

> "No urban renewal plan shall be carried out until the plan has been approved by the governing body of each municipality in which any portion of the area of the urban renewal plan is situated pursuant to ORS 457.095 and 457.105."

ORS 457.095 provides, as pertinent:

> "The governing body of the municipality, upon receipt of a proposed urban renewal plan and report from the municipality's urban renewal agency and after public notice and hearing and consideration of public testimony and planning commission recommendations, if any, may approve the urban renewal plan. The approval shall be by nonemergency ordinance which shall incorporate the plan by reference."

ORS 457.095 then sets out procedural requirements for the approval of "the municipality." ORS 457.105 provides:

> "In addition to the approval of a plan by the governing body of the municipality under ORS 457.095, the governing body of each other municipality in which any portion of the area of a proposed urban renewal plan is situated may approve the plan by proper resolution."

---

[1] The same amendment is also at issue in *Estate of Gold v. City of Portland,* 87 Or App 45, 740 P2d 812 (1987).

ORS 457.125 provides:

> "A copy of the ordinance approving an urban renewal plan under ORS 457.095 shall be sent by the governing body of the municipality to the urban renewal agency. A copy of the resolution approving an urban renewal plan under ORS 457.105 shall be sent by the governing body of a municipality to the urban renewal agency. Upon receipt of the necessary approval of each municipality['s] governing body, the urban renewal plan shall be recorded by the urban renewal agency with the recording officer of each county in which any portion of an urban renewal area within the plan is situated."[2]

Petitioner argues that the foregoing provisions are unambiguous and require the county governing body's approval, as well as the city's, for a plan amendment affecting territory within the jurisdiction of both. The city contends that the statutes are ambiguous, are inconsistent with the scheme of the urban renewal statutes and, if read literally, are conducive to absurd or unreasonable results. It argues that, when the plan approval statutes are read in the context of the statutory scheme and in the light of the legislative history, they should be construed as requiring county approval of a city plan or an amendment to a city plan *only* if unincorporated areas in the county are affected. LUBA agreed with the city's interpretation.

On their face, the statutes provide that a plan or amendment can take effect only if it is approved by each municipality which contains territory subject to the plan. The definitional provision, ORS 457.010(6), differentiates between "the municipality" for which the urban renewal agency is created, the city here, and other municipalities. ORS 457.085(6) makes approval of each municipality in which any area of the plan is situated a prerequisite to carrying out the plan. ORS 475.095 provides for approval of the plan by the governing body of "the municipality." ORS 457.105 then provides that, *in addition* to that body's approval, the governing body of each other municipality in which any area of the plan is located may approve it. ORS 457.125 makes the urban renewal agency's receipt of approvals under both ORS 457.095

---

[2] The parties agree, correctly, that the cited statutes are as applicable to this "substantial" plan amendment as to the adoption of a plan. *See* ORS 457.220(2). We will use the terms "plan" and "amendment" interchangeably in our discussion.

and ORS 457.105 necessary precursors to the agency's recording of the plan.

The city advances four arguments to support the interpretation that it urges us to adopt. The first is that ORS 457.095 uses the mandatory term "shall" in referring to the city's approval of the plan, while ORS 457.105 uses the permissive expression "may approve the plan." The city reasons that approval pursuant to the latter statute, unlike the former, is not a prerequisite to the effectiveness of a plan or amendment. We do not agree, however, with the city's distinction between the two statutes. ORS 475.095 uses the expression "may approve the urban renewal plan" in referring to the governing body's decisional option. That language is materially identical to the phrase in ORS 457.105 on which the city bases its distinction. The word "shall" in ORS 457.095 is used only in connection with the form of the city's action, *i.e.*, a nonemergency ordinance enacted in accordance with certain procedures and containing certain required findings and determinations.

LUBA surmised that the term "may approve" in ORS 457.105 "appears to be permission to grant the approval by resolution rather than by formal ordinance as in" ORS 457.095. A second possible explanation for the legislature's choice of the words "may approve" is implicit in LUBA's conclusion, with which we agreed in *Estate of Gold v. City of Portland, supra* note 1, that the process under ORS Chapter 457 is not "bound to result in a decision," *Strawberry Hill 4 Wheelers v. Benton Co. Bd. of Comm.,* 287 Or 591, 602, 601 P2d 369 (1979), and that the city council is free "to postpone or drop consideration of a plan or plan amendment."[3] Given that conclusion, the words "may approve" in ORS 457.095 and in ORS 457.105 appear to mean that the governing bodies are not required to make a decision one way or the other on a proposed plan or amendment.

However, the city is not aided simply because ORS 457.095 and ORS 457.105 allow the governing bodies to make a decision on a plan or plan amendment rather than requiring

---

[3] Although we agreed with LUBA's conclusion concerning the lack of necessity for a decision, we did not agree with its holding that quasi-judicial procedures were not required.

that they do so. ORS 457.085(6) makes it clear that a plan or amendment cannot take effect unless the governing bodies *do* make a decision and approve it. If the words "may approve" in ORS 457.105 mean that the county governing body need not take any action, the result of its inaction would be that the approval required by ORS 457.085(6) would be absent.

The city's next, and most forcefully offered, argument is that the provisions relating to approval by municipalities other than the one whose plan is involved "cannot be read in isolation and must be viewed in context with the entire Urban Renewal Statute." When so viewed, according to the city, the approval provisions are inconsistent with the statutory scheme if they are literally read and are, therefore, ambiguous. The city explains in its brief:

> "When a city creates an urban renewal agency and adopts an urban renewal plan for an area within the city's boundaries, the urban renewal statute gives the county in which the city is located a very limited role to play. The county does not prepare or administer the plan, acquire properties subject to the plan, develop or redevelop properties in accordance with the plan or issue bonds to secure funds for development activities. These are all activities carried out by the city and its urban renewal agency.

> "The county's role, like that of other taxing bodies, is a passive one and is limited to receipt of the proposed urban renewal plan or plan amendment and the accompanying report pursuant to ORS 457.085(5). The county only becomes a participant in the urban renewal process when the city chooses to use tax increment financing to fund development activities under the plan. Even then, the county's role is limited to the ministerial tasks of the County Assessor in certifying the pre-plan true cash value of all properties in the plan area, computing the tax levy for all taxing bodies within the plan area and collecting taxes. (See ORS 457.430-457.450.)[3]

> "When viewed in the context of this statutory scheme, petitioner's interpretation of the Urban Renewal Statute is nonsensical. This interpretation is contrary to the purpose of the Urban Renewal Statute which encourages cities and other local governments to improve economic and social conditions by the redevelopment of blighted areas within their jurisdictions. (See ORS 457.020.) It places the power to finally approve or disapprove a city's urban renewal plan with a governmental entity (the county) that has no responsibility to create, implement or fund the plan. In effect, it gives a county

veto power over a city's development. It allows a county to preclude a city from rehabilitating areas critical to the city's economic well-being by refusing to approve the city's urban renewal plan.

"Petitioner's interpretation of ORS 457.085(6) and 457.125 only makes sense, as LUBA recognized, when the area affected by an urban renewal plan or plan amendment includes unincorporated territory. Since a city urban renewal agency may exercise its powers beyond the territorial limits of the city pursuant to ORS 457.035(2), it is reasonable to require both the city and county to approve a plan or plan amendment if the plan or amendment includes both incorporated and unincorporated territory within the plan area. This reading of the Urban Renewal Statute harmonizes the definition of 'the municipality' in ORS 457.010(6), and the language of ORS 457.085(6) and 457.125 in a manner that is consistent with the regulatory scheme established by ORS Chapter 457 and the legislative history of that chapter.

---

"3. At page 5 of [petitioner's] brief, [petitioner] asserts that the approval of an urban renewal plan (or in this case, a substantial amendment to an urban renewal plan) has the effect of raising the amount of taxes paid by county citizens. This is not necessarily true. It is important to note that not all urban renewal plans need provide for the division of taxes under ORS 457.420 ('tax increment financing'). The agency must choose such a funding mechanism. If an agency adopts an urban renewal plan without tax increment financing, the approval of the plan would have no effect whatsoever on county taxpayers. In addition, the amount paid by county citizens is set by the county itself, based upon the county's determination of the amount of money needed to operate county services. A county could, by lowering its overall tax levy, keep the amount of taxes paid by its citizens constant or reduce that amount, notwithstanding the approval of an urban renewal plan. Therefore, it does not follow that adoption of an urban renewal plan raises the taxes of county citizens."

The essence of that argument is that, if the county must approve the city plan, the statutes conferring that authority on the county are at odds with the overall statutory scheme, under which the city is the major actor and the county is a minor actor at most. The problem with the argument is

that it demonstrates no *ambiguity* in the statutes which confer approval authority on the county governing body; what the argument shows instead is that, if the statutes are read literally, they are *inconsistent* with what the city *understands* to be the overriding policy of the Urban Renewal Act.

Under some circumstances, inconsistency between statutes relating to the same subject can create an ambiguity. However, the part of this statutory scheme to which the city points does not pertain to the same subject as the specific statutes which the city asks us to find ambiguous: the former relates to the operation of an urban renewal program after the plan is in effect; the latter relate to the procedures by which a plan is approved and takes effect. The city acknowledges that, minimal though it might be, a city's plan *can* have some effect on county government and county citizens, including those who reside in unincorporated areas. In the city's view, the likelihood and magnitude of that effect are not great enough for the county governing body to be given a voice in the approval of the city's plan. However, the legislature could — and did — take a different view from the city's on that policy question.

The city next argues that construing the statutes literally would produce an absurd or unreasonable result. LUBA agreed with that argument. We do not. The basis for the argument is the same supposed inconsistency with the statutory scheme as the city posited in support of its previous argument. The difference between the two arguments is that, to interpret a statute other than literally under the "absurd or unreasonable results" rationale, a court need not first determine that the statute is ambiguous. *See Johnson v. Star Machinery Co.,* 270 Or 694, 703, 530 P2d 53 (1975), and cases there cited. The court explained in *Johnson:*

> "[I]f the literal import of the words is so at variance with the apparent policy of the legislation as a whole as to bring about an unreasonable result, the literal interpretation must give way and the court must look beyond the words of the act." 270 Or at 704.

That doctrine must be applied with caution to assure that the line between judicial recognition of a statute's apparent policy and judicial amendment of the legislation is not crossed. We might agree with the city and LUBA that, given

the relative roles that the city and the county play with respect to the approved plan, it would make the most sense for the city to have the final decision-making authority about whether to approve it and for the county to have authority to approve or not approve it only if it would materially affect unincorporated areas. The appropriate question, however, is not whether something other than the legislature's literal words would have made sense, but whether the words it did use *cannot* make sense or reflect a rational legislative decision in the context of the statutory scheme. The answer to the latter question here is no. It is not absurd or unreasonable for a county governing body to have the ability to prevent the implementation of a plan which *can* have *any* effect on the county's government or its public. As we have noted, the city does not argue that city plans *can* have *no* such effect. It argues only that an effect will not *always* be present and will not often be of great magnitude. The city and the dissent consider it absurd and unreasonable for the county to have the ability to withhold approval of a plan which, if approved, would be far more relevant to the city than the county. All the city's brief and the dissent succeed in demonstrating, however, is that their authors would have enacted a different law if they had been the legislature. The statute which the legislature did adopt unambiguously gives county governing bodies authority to approve or not approve plans, and there is nothing absurd about the legislative policy to allow county governing bodies to prevent unilateral city action which *can* have an effect on a county's affairs and citizens.

The city's final argument is that the legislative history of the statutes favors the city's interpretation. Because the statutes are not ambiguous and do not necessarily lead to absurd results, we need not look to the legislative history.

Reversed.

**DEITS, J.**, dissenting.

I would affirm, because I believe that LUBA correctly concluded that Multnomah County's approval was not necessary for the adoption of the Tenth Amendment to the City's Urban Renewal Plan. As the majority points out, the key question concerns the interpretation of the requirement of ORS 457.085(6) that an urban renewal plan is not effective until it has been

"[A]pproved by the governing body of each municipality in which any portion of the area of the urban renewal plan is situated pursuant to ORS 457.095 and 457.105."

The majority construes that provision to require county approval any time that a city's plan includes any territory within the county. I would interpret it to require county approval only when the plan includes unincorporated areas of the county.

The majority holds that the language of the statute is unambiguous and concludes that it is compelled to apply the plain language of the statute. I agree that the statute is unambiguous on its face, but I believe that the application of the literal language achieves an unreasonable result and is clearly inconsistent with the legislative history and purpose of the law.

The general rule of statutory construction that a court must follow the plain meaning of unambiguous words is not totally inflexible and without exceptions. In *State ex rel Cox v. Wilson,* 277 Or 747, 562 P2d 172 (1977), the court approved the explanation by the United States Supreme Court of an exception to the general rule:

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination' * * *. (Footnotes omitted.)" 277 Or at 750, quoting *U.S. v. Amer. Trucking Assns.,* 310 US 534, 542, 60 S Ct 1059, 84 L Ed 2d 1345 (1940).

The adoption of the majority's interpretation would achieve an unreasonable result, plainly at variance with legislative intent. The urban renewal statutes were designed to

allow local governments to take actions to improve the economic and social conditions of blighted areas within their jurisdictions. The general urban renewal statutes provide that, when a city adopts an urban renewal plan which is completely within city boundaries, the county plays a very limited role. The county does not participate in the preparation and administration of the plan or participate in any way in the acquisition or development of property. The only function of the county occurs if the city decides to use tax increment funds to finance all or part of the plan. In that case, the county performs the ministerial function of certifying the true cash value of properties in the area, computing the tax levy for taxing bodies in the area and collecting taxes.

Under the majority's interpretation of ORS 457.085(6), even though no unincorporated land of the county is included in the plan, the county is given the authority to veto a city's urban renewal plan. That is unreasonable, because it takes away from the city the ultimate decision-making authority regarding he habilitation of land within its jurisdiction and gives it to the county.[1] That is wholly inconsistent with the general statutory scheme and with the legislative history of the law.

The legislative history supports the conclusion that the legislature intended to require *county* approval only when unincorporated areas of the county are included in a plan. The predecessor statutes to the current urban renewal and redevelopment statutes, Or Laws 1957, ch 456, §§ 1-20, required approval only by a city's governing body when an urban renewal plan did not include areas outside the city. The urban renewal statutes were amended in 1979. Or Laws 1979, ch 621, §§ 1-28. There is no indication in the legislative history that the sufficiency of only city approval when a plan included only territory within the city was meant to be changed. The 1979 session added the requirement that county approval is required when areas of the county are included in a city's urban renewal plan, but it is clear from the legislative record

---

[1] No county has asserted in this case or, to my knowledge, in any previous case involving land located entirely within the boundaries of a city, that it is required to approve the plan. Although certainly not determinative of the issue, the city's and the county's historical interpretation should be given some weight. *See Hay v. Oregon Dept. of Transportation,* 301 Or 129, 719 P2d 860 (1986).

that the requirement of county approval was limited to situations involving unincorporated areas of the county.[2]

 In my view, the more reasonable interpretation of the statute consistent with the legislative history and the purpose of the law is that approval of a county is required only when a city adopts an urban renewal plan which includes unincorporated areas of the county. I would affirm LUBA.

---

[2] The legislative history is outlined in the city's brief:

"The Senate Committee on Local Government took up consideration of House Bill 2083 on May 24, 1979. Oliver Norville, attorney for the Portland Development Commission and the Beaverton Urban Renewal Agency, explained the allocation of responsibility under the 1957 statute as follows:

" 'Any [urban renewal] plan must be approved by the governing body of any municipality in which it is located. If it goes outside the city's boundaries it has to be approved by the county. The only one I know of in Oregon, it seems to me, that exists is Beaverton. In that case both the City and County created an agency. Both the planning commissions reviewed every amendment and the project was carried out by the City of Beaverton and the Beaverton Urban Renewal Agency under agreement with the County.'

"(Senate Committee on Local Government, May 24, 1979, tape 30, side 1.)

"The Senate Committee heard testimony from a number of individuals on May 24 and May 29, 1979, and on June 4, 1979 the Committee administrator presented the Committee with a list of options for amendments drawn from testimony heard on the prior meeting dates. Item 7(b) on the amendment list was:

" 'Include requirement that county approve any plan outside of incorporated area but in county jurisdiction.'

"Legislative counsel explained item 7(b) as follows:

" 'There is one thing that is in the current law that I don't believe is in the bill and that is Item (b) in number 7 and that's a requirement that the county approve any plan outside of the incorporated area that's under county jurisdiction.'

"(Senate Committee on Local Government, June 7, 1979, tape 33, side 1.) Legislative counsel further explained:

" 'This is the first of several different places in the bill where we now create authority for municipalities in a neighboring area that have a portion of the urban plan in their area to approve that by resolution. And we wanted to make that clear.'

"(Senate Committee on Local Government, June 11, 1979, tape 33, side 2.) The concept embodied in Item 7(b) was incorporated into the bill as sections 2 and 3a (which now appear as ORS 457.085(6) and 457.105). The Senate Committee on Local Government unanimously adopted these amendments and passed the bill out of committee on June 11, 1979."